USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 09/11/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAYMOND JASON HENSLEY et al.,

Plaintiffs,

-v-

IEC ELECTRONICS CORP. et al.,

Defendants.

13-CV-4507 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

Plaintiffs Kevin Doherty, Raymond Jean Hensley, and Niraj Jetly bring this putative class action against IEC Electronics Corp. ("IEC") and two of its executives, W. Barry Gilbert and Vincent A. Leo (together with IEC, "Defendants"). Plaintiffs, on behalf of purchasers of IEC securities between February 8, 2012, and May 21, 2013 (the "Class Period"), allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78(b), 78(t)(a), and SEC Rule 10b-5, 17 C.F.R. § 240. (Consol. Class Action Compl. For Violations of the Fed. Sec. Laws (Docket No. 24) ("Compl.") ¶¶ 1, 25). Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants move to dismiss Plaintiffs' claims. (Docket No. 27). For the reasons stated below, Defendants' motion is GRANTED.

**BACKGROUND**

The following facts are taken from the Consolidated Class Action Complaint ("Complaint"); documents referenced therein; and documents of which the Court may take judicial notice, such as filings with the United States Securities and Exchange Commission ("SEC"). *See, e.g.*, *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir.

2006) (summary order) ("[J]udicial notice of [an SEC] filing [is] properly within the [district] court's discretion on a motion to dismiss."). The allegations in the Complaint are assumed to be true for purposes of this motion. *See, e.g.*, *Kalnit v. Eichler*, 264 F.3d 131, 135 (2d Cir. 2001).

IEC is a publicly traded Delaware corporation that provides electronic contract manufacturing services. (Compl. ¶ 35). More specifically, it manufactures custom "complex circuit cards and system-level assemblies," "cable and wire harness assemblies," and "precision sheet metal components." (*Id.* ¶¶ 2, 35). It has a broad customer base extending across the aerospace, defense, industrial, transportation, medical, metalworking, and wire-and-cable-assembly business sectors. (*Id.* ¶¶ 3, 35). IEC "focuses on low-to-medium volume, high-mix production." (*Id.* ¶ 35; *see also id.* ¶¶ 45-48). Defendant Gilbert is IEC's Chief Executive Officer ("CEO") and Chairman of its Board of Directors. (*Id.* ¶ 31). Defendant Leo, a shareholder at the accounting firm Insero & Company ("Insero"), is IEC's interim Chief Financial Officer ("CFO"), a position he assumed on January 2, 2012. (*Id.* ¶¶ 8-9, 58-59). Even after his appointment as CFO, Leo maintained his affiliation with Insero, which provides services to IEC; Leo receives distributions from Insero and was not compensated directly by IEC. (*Id.* ¶¶ 9, 59).

In 2008, IEC began acquiring companies that produced relatively small quantities of specialized products at high margins. (*Id.* ¶¶ 3-4, 35-40, 47-48). In December 2010, IEC made its largest acquisition, purchasing Southern California Braiding, Inc. ("SCB"), a privately held company based in Los Angeles, for approximately $26 million. (*Id.* ¶¶ 4, 40-44). After the acquisition, IEC began to integrate SCB into the company and expressed high hopes for its growth, describing SCB as a "well run company with strong margins." (*Id.* ¶¶ 6-7, 43, 49-50, 54-55). On January 4, 2011, at its annual shareholder meeting, IEC described its "[l]ow volume,

high value manufacturing" business model and stated that SCB was "[i]mmediately accretive to IEC's shareholders." (*Id.* ¶ 48 & n.2). During a quarterly call the following month with investors and analysts, Gilbert reemphasized SCB's "strong margins" and how it would be immediately beneficial to shareholders. (*Id.* ¶ 50). During another quarterly call, Gilbert specified that IEC's operating margins were "some of the best in the industry." (*Id.* ¶ 52).

SCB showed some signs of trouble in late 2011 and early 2012 (*id.* ¶¶ 55-56, 61-63), but from May 2012 through early 2013, IEC and Gilbert made or issued a series of statements indicating that SCB's performance was generally strong and that their expectations for SCB remained high (*id.* ¶¶ 69-72, 77-80, 85). On May 1, 2013, however, IEC disclosed that it had discovered "an error in accounting for work-in-process inventory" — that is, inventory in the production process at the end of a reporting period that has not been completed and transferred to inventory available for sale (*id.* ¶ 113) — requiring a restatement of the company's consolidated financial statements for the fiscal year 2012 and quarterly reports for the fiscal year 2012 and the first quarter of 2013. (*Id.* ¶¶ 14, 96). The company reported that the accounting error resulted in "an aggregate understatement of cost of sales and an aggregate overstatement of gross profit during all such [r]estated [p]eriods," totaling $2.2 million. (*Id.* ¶ 96; *see also id.* ¶ 14). Among other things, IEC revealed that the net gain reported for the first quarter of fiscal year 2013 was in fact a net loss. (*Id.* ¶ 96). The next day, IEC's stock price fell $0.50 per share, or nearly 9%. (*Id.* ¶ 97). A day later, it declined another $0.22 per share — an additional 4.23%. (*Id.*).

Over the next few weeks, the disclosures continued. On May 13, 2013, for example, IEC reported that "[t]he same error was made during the Company's fiscal year ended September 30, 2011 ('FY 2011'), and the quarterly periods ended during FY 2011, but did not have a material impact on the Company's consolidated financial statements." (*Id.* ¶ 98). One week later, IEC

announced that it had delayed its restatement because "the Audit committee" had "determined further review of the facts and circumstances giving rise to the restatement [was] necessary." (*Id.* ¶ 99). That day, IEC's price decreased $0.67 per share, or nearly 14%. (*Id.* ¶ 100). The next day — after the company announced that it had received a notice from the New York Stock Exchange that "the Exchange [was] authorized to suspend and remove the Company's securities from the Exchange unless prompt corrective action [was] taken" (*id.* ¶ 101) — IEC's shares dropped another $0.68, or more than 16% (*id.* ¶ 102).

On June 3, 2013, IEC filed a restatement explaining that "the Company overcapitalized labor and overhead costs in SCB's work-in-process inventory." (*Id.* ¶ 103). It maintained that the overcapitalization error was the "result of failure to accurately factor in the stage of completion for the work-in-process inventory." (*Id.*). In an amended Form 10-K/A, issued the same day, IEC wrote that its "Chief Executive Officer and Chief Financial Officer [had] concluded that the Company did not maintain effective internal control over financial reporting as of September 30, 2012," and that "material weakness[es] in [IEC's] internal control over financial reporting resulted in the restatement[s]." (*Id.*). They had "identified control deficiencies related to the Company's reconciliation and review of work-in-process inventory as well as financial review and analysis." (*Id.*). IEC "implemented certain remedial measures" to cure those material weaknesses, but "the material weakness[es could not] be considered fully remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively." (*Id.*).

On June 28, 2013, Hensley commenced this lawsuit, on behalf of purchasers of IEC securities during the Class Period (between February 8, 2012, and May 21, 2013), seeking to recover damages for Defendants' alleged violations of Sections 10(b) and 20(a) of the Exchange

Act and SEC Rule 10b-5. (Class Action Compl. (Docket No. 1) ¶¶ 1, 12). On September 17, 2013, the Court consolidated Henley's case with another — *Jetly v. IEC Electronics Corp.*, 13-CV-5864 (JMF) — and appointed Kevin Doherty as the Lead Plaintiff. (Docket No. 21). Approximately two months later, on November 15, 2013, Plaintiffs filed a Consolidated Class Action Complaint, which alleges that Defendants, "through material representations and/or omissions" during the Class Period, "deceive[d] the investing public" and "cause[d] Plaintiff and other members of the Class to purchase IEC securities at artificially inflated prices" in violation of Section 10(b) of the Exchange Act. (Compl. ¶¶ 169-78). It further alleges that the individual Defendants, Gilbert and Leo, violated Section 20(a) of the Exchange Act "by their acts and/or omissions" through "their positions as controlling persons." (*Id.* ¶ 182).

**DISCUSSION**

A motion pursuant to Rule 12(b)(6) challenges the sufficiency of the allegations in the complaint. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive such a motion, the plaintiff's complaint must, as a general matter, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

Because they allege securities fraud, Plaintiffs must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b),

which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — be pleaded with particularity, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted). To meet that requirement, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)). The "strong inference" must be "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314 (internal quotation marks omitted). The necessary inquiry is "inherently comparative." *Id.* at 323. That is, the Court "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. A complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comm'cns*, 493 F.3d at 99. Plaintiffs effectively concede that they have not adequately pleaded scienter under the first theory. (Lead Pl.'s Mem. Law Opp'n Defs.' Mot. To Dismiss Consol. Am. Compl. (Docket No. 31) ("Pls.' Mem.") 19-21; *see* Reply Mem. Supp. Defs.' Mot. To Dismiss Consol. Am. Compl. (Docket No. 33) ("Defs.' Reply Mem.") 2-3). That concession is well founded. Plaintiffs do not allege that either Gilbert or Leo sold shares of IEC stock during the Class Period. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding "no personal interest sufficient to establish motive" where "[p]laintiffs [did] not allege

that defendants sold stock or profited in any way during the relevant period"). And while they do allege that Defendants had an interest in keeping IEC's stock price high and an opportunity to commit fraud by virtue of their positions, those sorts of generic allegations are insufficient to satisfy the scienter requirement. *See, e.g.*, *South Cherry Street, LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108-09 (2d Cir. 2009) ("[I]n attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." (internal quotation marks omitted)).

Plaintiffs are left to rely on the second "conscious misbehavior" theory. To survive dismissal under that theory, Plaintiffs must show that they allege "reckless conduct" by Defendants, "which is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Kalnit*, 264 F.3d at 142 (quoting *In Re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). The inquiry is "highly fact-based." *Id.* As a general matter, however, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (noting as well that "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness" (alterations in original) (internal quotation marks omitted)).

Here, in arguing that they meet that standard, Plaintiffs rely heavily on the "core operations doctrine." (Pls.' Mem. 12-15). That doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business," which "include matters critical to the long term viability of the company and events affecting a significant source of income." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CV-8557 (CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (internal quotation marks omitted). Under the doctrine, if a plaintiff "has adequately alleged that the defendant made false or misleading statements," and "those statements concerned the core operations of the company," the well-pleaded allegations themselves "support[] the inference that the defendant knew or should have known the statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *see also, e.g.*, *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005) ("When information is at the core of a company's business, it may be properly ascribable to senior officers.").

As Defendants note, there is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid. (Defs.' Reply Mem. 4-6 & n.4 (citing cases)). In this case, however, the Court need not answer that question, as even if the doctrine remains valid it would not apply in the present circumstances. Courts applying the doctrine have generally "required that the operation in question constitute nearly all of a company's business before finding scienter." *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011). Here, although the Complaint alleges that SCB was an expensive acquisition that IEC touted (Compl. ¶¶ 6-7, 43, 48-50, 54-55), SCB cannot be said to have "constitute[d] nearly all" of IEC's business. In fact, for fiscal year 2011, SCB contributed only about fifteen percent of IEC's total revenue. (*Id.* ¶¶ 43, 85; *see* Defs.' Reply Mem. 5).

Further, accounting for "work-in-process" inventory — the source of the error that led to the restatement and the alleged false statements by Defendants — could not be described as (and, more to the point, is not alleged in the Complaint to be) a "core operation" of SCB, let alone IEC. *See, e.g.*, *JP Morgan Chase*, 363 F. Supp. 2d at 628 ("[P]laintiffs allege no facts suggesting that the accounting treatment of the Mahonia transactions as trades rather than as loans was at the core of JPM Chase's business."); *In re OSG Sec. Litig.*, 917 F. Supp. 2d. 387, 409 (S.D.N.Y. 2013) ("The Company's core operation is shipping, not tax policy.").

In the absence of the core operations doctrine, Plaintiffs are left to rely on circumstantial evidence to satisfy their scienter pleading requirement. In particular, they cite the size, timing, and duration of the accounting errors as circumstantial evidence of Defendants' knowledge. (Pls.' Mem. 14-19).[1] The timing of the accounting errors, however, actually cuts against a finding of scienter as to Defendant Leo, as IEC restated financial results dating back to even before Leo took over as CFO. (*See* Compl. ¶ 98 (noting that the accounting error dated back to fiscal year 2011). *Compare id.* ¶ 14 (alleging that IEC restated its financials beginning with the first quarter of 2012), *with id.* ¶¶ 58-59 (alleging that Leo became CFO in the second quarter of 2012)). Plaintiffs' arguments regarding the size and duration of the accounting errors, on the other hand, fail for the same reason that their reliance on the core operations doctrine is misplaced: The error was not large or fundamental enough, without more, to provide "strong

[1] Plaintiffs also rely on a confidential witness who speculates that Gilbert did not want to reveal to IEC's Board the problems at SCB (Compl. ¶ 68(j)), but Plaintiffs themselves "concede that [the confidential witness] does not have personal knowledge of Gilbert's actions during the Class Period" (Pl.'s Mem. 21 n.20). "[C]onfidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements . . . and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011).

circumstantial evidence of conscious misbehavior or recklessness," *ATSI Comm'cns*, 493 F.3d at 99, especially in the absence of allegations of motive, *see, e.g.*, *Kalnit*, 264 F.3d at 142 (noting that, in the absence of a motive allegation, "the strength of circumstantial allegations [of scienter] must be correspondingly greater" (internal quotation marks omitted)).[2]

In the final analysis, the Complaint falls far short of alleging "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142. Here, unlike in *Novak*, there is no direct indication that "Defendants knew at all relevant times that the [c]ompany had serious inventory problems." 216 F.3d at 311. Nor are there allegations, as in *Novak*, that Defendants approved of inventory management practices that resulted in materially misleading filings or that they made misleading public statements despite knowledge of the true inventory levels. *See id.* Instead, Plaintiffs allege an accounting error, however substantial, that was highly technical in nature; did not affect the company as a whole; and was discovered, disclosed, and corrected by Defendants themselves. (Compl. ¶¶ 14, 96, 99, 103). Even viewing the allegations "holistically," as the Court must, *Tellabs*, 551 U.S. at 326, they do not suffice to allege scienter. *See, e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Ordering an investigation . . . was a prudent course of action that weakens rather than strengthens an inference of scienter." (internal quotation marks

---

[2] Plaintiffs' strongest argument may ultimately be the fact that the accounting error increased in size over time, even though the work-in-process inventory at the end of a given quarter reflected different product units than the inventory at the end of the prior quarter. (Pls.' Mem. 17-18). As Defendants note, however, "IEC is required by accounting rules to develop a process for allocating labor and overhead costs to inventory" and "[s]uch a process can increase the capitalization of costs for work-in-process inventory, augmenting the size of the error each quarter." (Defs.' Reply Mem. 8 n.7 (citing Compl. ¶¶ 112, 114; Decl. Stewart D. Aaron Supp. Defs.' Mot. To Dismiss Consol. Am. Compl. (Docket No. 29), Ex. B (Form 10-K/A (July 3, 2013)) at 86)). In any event, the increasing size of the error, either considered by itself or in conjunction with Plaintiffs' other allegations, does not give rise to a strong inference that Defendants acted with the required state of mind.

omitted)). It follows that, whether or not Plaintiffs could satisfy the other elements of a securities fraud claim, their claims against IEC fail, as do their "control person" claims against Gilbert and Leo, which depend upon the existence of a "primary violation." *See, e.g.*, *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 139 (2d Cir. 2011); *see also, e.g.*, *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 293 (S.D.N.Y. 2011) ("Because the Plaintiff has failed to plead a primary violation of the securities laws, his control-person claim is also dismissed.").

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, and the Complaint is dismissed.

Further, although Plaintiffs make a perfunctory request for leave to amend to cure any deficiencies in their complaint (Pls.' Mem. 25), their request is denied on the ground of futility. *See, e.g.*, *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ("Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party."). Rule 15(a) of the Federal Rules of Civil Procedure "is not a shield against dismissal to be invoked as either a makeweight or a fallback position in response to a dispositive motion." *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07-CV-318 (RJS), 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009). Accordingly, "[i]n the absence of any identification of how a further amendment would improve upon the Complaint," a court may deny leave to amend "as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F.Supp.2d 385, 391 (S.D.N.Y. 2004); *see also Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) (per curiam) ("[A]n amendment is not warranted absent some indication as to what appellants might add to their complaint in order to make it viable." (internal quotation marks and alteration omitted)).

Here, Plaintiffs' sole proffer of what they could add in an amended complaint — relegated to a footnote — is "additional information" from a confidential witness "concerning SCB's Division Controller's communications with Defendants concerning SCB's accounting issues."  (Pls.' Mem. 25 n.22).  By Plaintiffs' own admission, however, the confidential witness lacks any personal knowledge of Defendants' actions during the Class Period.  (Pls.' Mem. 21 n.20).  Thus, Plaintiffs have given "no indication" that they could allege any additional facts to establish the requisite intent.  *Chill v. General Elec. Co.*, 101 F.3d 263, 272 (2d Cir. 1996); *see also, e.g.*, *SKR Res., Inc. v. Players Sports, Inc.*, 938 F. Supp. 235, 239 (S.D.N.Y. 1996).

The Clerk of Court is directed to terminate Docket No. 27 and to close the case.

SO ORDERED.

Date: September 11, 2014
      New York, New York

JESSE M. FURMAN
United States District Judge